## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

REBECCA MARTIN,

     *Plaintiff,*

*v.*                           CASE NO. 11-CV-11710

COMMISSIONER OF             DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,            MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 15.)

Plaintiff Rebecca Martin was 25 years of age at the time of the most recent administrative hearing.[2] (Transcript, Doc. 9 at 25, 104, 109.) Plaintiff's employment history includes work as a cook and retail sales employee. (Tr. at 152.) Plaintiff filed the instant claims on December 17 and 19, 2006, alleging that she became unable to work on May 1, 2003. (Tr. at 104, 109.) The claims were denied at the initial administrative stages. (Tr. at 51, 52.) In denying Plaintiff's claims, the Commissioner considered affective disorders and anxiety-related disorders as possible bases for disability. (*Id.*) On June 23, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Paul R. Armstrong, who considered the application for benefits *de novo*. (Tr. at 12-24, 25-49.) In a decision dated July 24, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 24.) Plaintiff requested a review of this decision on August 17, 2009. (Tr. at 9-11.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on February 15, 2011, when, after the review of additional exhibits[3] (Tr. at 458-77), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On April 19, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

---

[2]Rebecca Martin is referred to in the administrative record by her married name, Rebecca Marchand.

[3]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d

3

at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

D.    **ALJ Findings**

6

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through March 31, 2006, and that Plaintiff had not engaged in substantial gainful activity since May 1, 2003, the alleged onset date. (Tr. at 17.) At step two, the ALJ found that Plaintiff's affective disorder and polysubstance abuse were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 18-19) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 22-23.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual age 18 to 44. (*Id.*) At step five, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with the following nonexertional limitations: the claimant is limited to simple, unskilled work, should not work with the public, and should have no more than superficial contact with supervisors and co-employees . (Tr. at 19-22.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 23-24.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated at the Bayside Health Center from April 2004 to July 2006 for depression/anxiety and frequent urinary tract infections ("UTIs"). (Tr. at 199-242.)

On May 12, 2004, an ultrasound of Plaintiff's right upper quadrant was ordered because of "[h]epatitis, drug induced"; it showed that her "[g]all bladder wall thickening" and that her liver and right kidney were normal. (Tr. at 241.)

On January 12, 2006, Plaintiff was examined by Richard Jankowski, M.D., who found "[m]arkedly dilated pelvocalyceal system of the left kidney compatible with chronic

hydronephrosis although there is some compromise in the region of the left UP junction but some narrowing in this location cannot be excluded." (Tr. at 240.)

Plaintiff was also treated by Glenn E. Kershon, M.D., from March 2006 through September 2006. (Tr. at 243-51.) Dr. Kershon noted Plaintiff's "childhood [six year-old] repair of a ureteropelvic junction [UJT] obstruction." (Tr. at 244, 247.) On September 11, 2006, a cystoscopy was performed to address the UJT obstruction, which was found to be "more functional than anatomical," and a UJT stent was implanted. On September 22, 2006, the stent that was placed in Plaintiff's left kidney was removed and it was noted that Plaintiff had a "possibly functional but no anatomical obstruction of the [UJT] of her left kidney." (Tr. at 244.) The doctor planned to see Plaintiff in two months. (*Id*.)

On March 23, 2007, Plaintiff was evaluated by George Pestrue, Ph.D., at the Bay-Arenac Behavioral Health Center. (Tr. at 252-59.) Dr. Pestrue diagnosed Plaintiff with Bipolar I Disorder, Social Anxiety Disorder, a GAF score of 55, and a guarded prognosis. (Tr. at 259.) At the time of the evaluation, Plaintiff indicated that she had run out of her medication (Lexapro) about a month before and she had not gotten a refill. (Tr. at 254.) Plaintiff reported that she had "a lot of anger issues," that she got "upset real easy," and that when mad she yells and throws things. (Tr. at 253.) She stated that her kids upset her a lot, her husband "taking off" upsets her, and that when upset she gets violent, punching walls and doors, and has even hit her husband. (*Id*.) She reported that she "was mad at [her] husband one day and . . . took a bottle of bleach and dumped it on his work uniform and that ruined them . . . ." (*Id*.) She stated that sometimes she cleans her "house everyday and all day . . . I'll have a lot of energy then." (*Id*.) In her depressive times, Plaintiff indicated that she will "sleep 10 to 12 hours at night then . . . be real lazy during the days" and not do much or even leave the house. (Tr. at 254.) She stated that when she's on a "high" she'll "eat once a day

maybe," but when depressed will "eat a lot more" and will "be down like this for up to a month."
(*Id.*) Her "down times last longer than . . . up times." (*Id.*) Plaintiff reported that she drinks alcohol
"maybe twice a month," but when she does, she drinks a lot. (Tr. at 255.) She'll "drink a half of
a fifth of whiskey" and that when she drinks, she drinks "to get drunk," but stated that it's "not a
problem." (*Id.*) Plaintiff also reported that she "used to use a lot of marijuana when [she] was in
high school," but that she doesn't "use any of that anymore." (*Id.*) She also indicated that she
smokes five cigarettes a day. (*Id.*) Plaintiff stated that she likes to go bowling, make hemp
necklaces, and that she plays softball on a team in the summer. (*Id.*)

Dr. Pestrue noted that Plaintiff "showed adequate contact with reality," "showed fair insight
into her status," "showed a fair sense of autonomy," and that her "stream of mental activity was
spontaneous" and her "responses were reasonable and logical." (Tr. at 256.) Dr. Pestrue also noted
that Plaintiff "appeared to be moderately depressed" and "moderately anxious and tense," but was
not "significantly angry, suspicious or fearful" and was "friendly with this examiner." (Tr. at 257.)

A Mental RFC Assessment completed on April 17, 2007, by Ron Marshall, Ph.D.,
concluded that Plaintiff was moderately limited in her ability to understand and remember detailed
instructions, to carry out detailed instructions, and to work in coordination with or proximity to
others without being distracted by them, but was not otherwise significantly limited in
understanding, memory or sustained concentration and persistence. (Tr. at 265-66.) Dr. Marshall
also found that Plaintiff was moderately limited in her ability to interact appropriately with the
general public, to accept instructions and respond appropriately to criticism from supervisors, to
get along with coworkers, to respond appropriately to changes in the work setting, and to travel
in unfamiliar places or use public transportation, but was otherwise not significantly limited in
social interaction or adaptation. (Tr. at 266.)

9

A Psychiatric Review Technique was also completed on April 17, 2007, by Dr. Marshall. (Tr. at 269-82.) Dr. Marshall diagnosed Plaintiff with Affective Disorders (Bipolar Syndrome) and Anxiety-related Disorders (Social Anxiety Disorder). (Tr. at 269, 272, 274.) Dr. Marshall concluded that Plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. at 279.) Dr. Marshall found Plaintiff's allegations "partially credible" because the evidence "support[ed] the [claimant's] alleged condition, but not the allegation that the [claimant's] alleged condition prevents her from doing all types of work." (Tr. at 281.) Dr. Marshall further concluded that Plaintiff "[m]ay work better with minimal contact with the public" and that she "[r]etains the ability to do rote tasks on a sustained basis." (*Id.*)

Plaintiff was counseled and her medications were reviewed by the MPA Group, Ltd., from July 2007 through October 2007. (Tr. at 284-98.) On September 17, 2007, it was noted that Plaintiff "dropped out of therapy" after three sessions. (Tr. at 285.) On the previous visit, which occurred on August 8, 2007, it was noted that Plaintiff "drinks alcohol at least once per week," that "approximately one-fifth is split between her and her husband" and that she reported "using marijuana at least once every two weeks." (Tr. at 285.) It was recommended that "she discontinue both of these practices immediately." (*Id.*)

Plaintiff was treated at Bay Regional Medical Center from July 2007 through December 2007 for arm pain after a fall. (Tr. at 299-326.)

Plaintiff was also counseled by Marie Miller, LMSW, and her medications adjusted by Michael Ossian, D.O., at Bay Arenac Behavioral Health[4] ("BABH") from September 2007 through November 2009. (Tr. at 327-83, 404-46, 453-76.) In September 2008, BABH assessed Plaintiff

_____

[4]Also known as Bay Arenac Mental Health.

as being "coherent and her thoughts logical[,]" of "above average" intellectual functioning, having "adequate" concentration and attention, "adequate" decision-making ability, as well as "adequate" follow-through and coping abilities. (Tr. at 442.) Plaintiff was diagnosed with Bipolar Disorder I, Anxiety Disorder, and Borderline Personality Disorder and was given a GAF score of 47-50. (Tr. at 443.) "After assessing the consumer's skills, it was determined that the consumer is functionally independent in all areas of daily living, self-care, socialization and communication." (Tr. at 439.)

In October 2008, Plaintiff's person-centered plan included goals of keeping balance in her mood, and being compliant with recommendations while on probation, including attending 26 weeks of domestic violence classes. (Tr. at 430, 432.) On November 19, 2008, it was noted that Plaintiff was making "moderate progress" toward the goals of keeping scheduled appointments and being compliant with medications as prescribed by Dr. Ossian. (Tr. at 423.) Plaintiff was also noted to have made "slight progress" with adopting effective ways to redirect negative behavior and thoughts. (*Id.*) Plaintiff also reported "doing good" despite being "upset" with a Friend of the Court decision regarding her son because she felt it was based on "lies told by the spouse." (Tr. at 424.)  The decision included supervised visitation every other week at a local fast food restaurant. (*Id.*)  Plaintiff further reported that she was attending domestic violence classes and reporting to her probation officer. (*Id.*)

On December 15, 2008, Plaintiff called BABH, indicating that she was having a panic attack at Work First, and asking what to do. (Tr. at 422.) The therapist informed her to "talk to the worker at the program about her current situation" and did not authorize Plaintiff to leave Work First. (*Id.*) Although Plaintiff had an appointment to come into the clinic that day, Plaintiff cancelled her appointment "when she was informed that Dr. Ossian wouldn't be in." (*Id.*)

Although Plaintiff's Family Independence Program ("FIP") benefits[5] had been terminated for her failure to comply with the Jobs, Education and Training ("JET") program when she left Work First without any follow-up compliance, an ALJ of the Department of Human Services ("DHS") found good cause for Plaintiff's noncompliance and reinstated her benefits on April 14, 2009. (Tr. at 448-52.)

On December 22, 2008, Dr. Ossian recommended hospitalization due to Plaintiff's suicidal ideation and depression after an "altercation with a boyfriend, going through a divorce, missing her children and grieving the death of her father this year and a brother last year." (Tr. at 420.) Although Plaintiff initially agreed to hospitalization, when she learned that she might not be discharged for Christmas, Plaintiff declined voluntary admission and went to Toys for Tots to pick up presents for her six-year-old daughter and thirteen-year-old son. (*Id.*)

On September 30, 2009, Plaintiff reported that she "[r]ecently [] cut self on her arm to relieve tension [and] denies that she's suicidal, homicidal, or psychotic." (Tr. at 464.) On that same day, Dr. Ossian wrote a letter "[t]o whom it may concern." (Tr. at 477.) In the letter, Dr. Ossian briefly listed Plaintiff's diagnosis and her current symptoms, indicated that her medications had been adjusted that day to "assist her with keeping her mood stable," and stated that, "[d]ue to her present mental status, I don't believe that it is in Rebecca's best interest to take on a job at this time." (Tr. at 477.)

Plaintiff was also treated at List Psychological from May 2007 through July 2007. (Tr. at 388-403.) On May 5, 2007, it was noted that Plaintiff had recently been fired from her job for fighting with a co-worker and that Plaintiff believed "it was his fault she got fired" and that she

---

[5]These benefits replaced the Aid to Dependent Children ("ADC") program effective October 1, 1996. (Tr. at 450.)

had "thoughts of hurting him at times." (Tr. at 397.) Plaintiff was discharged because her therapist left the company and Plaintiff "declined transfer" to another therapist. (Tr. at 389.)

In her Daily Function Report, Plaintiff indicated that she is able to cook, do housework (including dishes, laundry, vacuuming, and cleaning the bathrooms), give her children baths, change diapers, let her dog out, feed and water the dog and lizards, drive and ride in cars, take her daughter to dance, shop in stores, read magazines, make hemp necklaces, watch television and take care of her family. (Tr. at 174-78.) Plaintiff indicated that some nights she doesn't sleep much, but sometimes she sleeps too much. (Tr. at 175.) Plaintiff also stated that she skips a shower and hair-brushing some days but did not indicate that she has any problems doing these personal care chores. (Tr. at 175.) Although she indicated she is "not good with money," she also stated that this condition has not changed since her illness. (Tr. at 177-78.)

At the administrative hearing, Plaintiff testified that her eight-year-old daughter is in a gifted program at school and that she gets supervised visits with her son on an irregular schedule. (Tr. at 30-31.) Plaintiff indicated that she was off probation and that she has stopped using alcohol because of the medication she is on. (*Id.*) Plaintiff stated that when she was drinking, she would split a fifth of whiskey with her then-husband. (Tr. at 31-32.) Plaintiff further testified that she "did Valium with [her] father when [she] was like 12 years old" and that she used marijuana at least once every other week. (Tr. at 32.)

Plaintiff stated that she stopped using marijuana after she "got dropped dirty for visits with [her] son" which was in April 2008. (*Id.*) Plaintiff also stated that she was feeling better being off substances and that her medicine had really helped with her panic attacks. (*Id.*) However, in response to her attorney's questioning, she stated that even if she has taken her medicine (two Ativan), she can still have panic attacks and she recently had one in her dentist's office and had

to walk out. (Tr. at 45-46.) Plaintiff reported that holding ice cubes, taking a cold shower, or snapping a rubber band on her wrist helps lessen the effects of the panic attacks. (Tr. at 46.)

Plaintiff indicated that she had a kidney operation when she was five years old and that in 2006 she had another kidney operation "when [she] had the stent put in"; however, it was removed later that month because of complications. (Tr. at 33, 39.) Plaintiff further testified that she has urinary tract infections "at least once a month." (Tr. at 40.)

Plaintiff also stated that her "up periods" last a "week or two when [she] can get up and really take care of [her] kids and take care of the house and do what [she has] to do," but then her "down periods last like a month or two where [she's] very depressed and . . . can't really function at all." (Tr. at 39.) Plaintiff added that she only sleeps three to five hours per night when she is in her "up periods." (Tr. at 41.)

Plaintiff testified that she was on state-funded assistance but that the state "cut [her] off" because she did not have "good cause" for failing to go to "Work First" and seek employment. (Tr. at 37.) Plaintiff further testified that she had a panic attack in the lobby when she went to Work First so she never got to the point where she could look for a job. (Tr. at 41.) "[T]hey tried sending [her] back to Work First again but then [she] went and got proper documentation from [her] doctor stating that . . . he don't believe [it was] the right time for [her] to start Work First." (Tr. at 43.)

Plaintiff indicated that she attempted suicide in 1998 and again by overdose in 2003, but that she has not attempted suicide since then although she has "cut [her] wrists and stuff but nothing real serious." (Tr. at 42.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an individual:

> without any exertional limitations but limited to simple, unskilled work because of the bipolar. Often times because of the highs and lows they have a rough time

14

concentrating on more than simple, unskilled work. Also limited to no work not involving public contact and no more than superficial contact with supervisors and co-employees.

(Tr. at 47.) The VE testified that such a person would not be able to perform Plaintiff's past relevant work but could perform the 900 janitorial, 850 assembly, and 800 packaging positions available in Southeastern Michigan. (Tr. at 47-48.) If such a person were off-task due to panic attacks for an hour a day, these jobs would not be available according to the VE. (Tr. at 48.) If the individual had difficulty getting out of the house on a routine basis and would need to miss more than two days a month, the VE testified that such a person would also be precluded from substantial gainful activity. (*Id.*)

### F.      Analysis and Conclusions

### 1.      Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: the claimant is limited to simple, unskilled work, should not work with the public and should have no more than superficial contact with supervisors and co-employees. (Tr. at 19-22.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 12.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even

where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ's finding that Plaintiff's chronic hydronephrosis and recurrent urinary tract infections were not severe is not supported by substantial evidence. (Doc. 12 at 7-9.) Plaintiff also contends that the ALJ did not properly weigh the treating source opinions. (*Id*. at 9-14.) Plaintiff argues that the ALJ exhibited partiality against Plaintiff at the hearing (*id*. at 14-17), and that the ALJ applied an erroneous legal standard in finding that substance abuse aggravated Plaintiff's symptoms. (*Id*. at 17-19.)

### a.      Non-Severe Impairments

With regard to Plaintiff's contention regarding her chronic hydronephrosis and recurrent urinary tract infections, the Court notes that, in the Sixth Circuit, "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs*, 880 F.2d at 862. The test is used to "screen out totally groundless claims." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

In the instant case, the ALJ found that Plaintiff's affective disorder and polysubstance abuse were "severe" within the meaning of the second sequential step. (Tr. at 17.) Plaintiff contends that the ALJ improperly omitted Plaintiff's chronic hydronephrosis and recurrent urinary tract infections from the list of severe impairments. (Doc. 12 at 7-9.) However, Plaintiff fails to recognize that once Step Two is "cleared" by a finding that some severe impairment exists, then

the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 Fed. App'x at 457. "The fact that some of [Plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, any alleged omission from the list of severe impairments does not undermine the ALJ's decision.

### b.     Treating Source Opinions

Plaintiff contends that the ALJ did not properly weigh the treating source opinions. (Doc. 12 at 9-14.) In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give

controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. Where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This

18

requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at \*4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The treating physician rule applies when the treating source opinion is a *medical* opinion; however, "[w]hen a treating physician instead submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is 'disabled' or 'unable to work' – the opinion is not entitled to any particular weight." *Turner v. Comm'r of Soc. Sec.*, 381 Fed. App'x 488, 492-93 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d), 1527(e), 416.927(e); S.S.R. 96-5p; and *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

To the extent that Plaintiff reads Dr. Ossian's conclusion as a statement that she is disabled for social security purposes when he stated that, "[d]ue to her present mental status, I don't believe that it is in Rebecca's best interest to take on a job at this time" (Tr. at 477), this opinion is not entitled to any particular weight since "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner." *Kidd v. Commissioner*, 283 Fed. App'x 336, 341 (6th Cir. 2008); *Turner*, 381 Fed. App'x at 492-93.

Plaintiff also refers to a letter written by Marie Miller, Plaintiff's therapist. The letter states, "I don't believe it would be in Rebecca's best interest to take on the responsibility of a job at this time." (Tr. at 457.) Plaintiff's therapist's conclusion that Plaintiff is unable to work is not an opinion of a treating source as defined in the regulations. *See* 20 C.F.R. § 404.1513(a); *Miller v. Comm'r of Soc. Sec.*, No. 1:08-CV-1022, 2010 WL 502761, at \*5 (W.D. Mich. Feb. 5, 2010) (citing *Doolin v. Astrue*, No. 3:08-cv-243, 2009 WL 1212232, at \*8 (S.D. Ohio May 1, 2009) ("a

counselor's opinion is not entitled to controlling weight")). Furthermore, even if it were an opinion by a treating source, it is not a *medical* opinion subject to deference but rather a conclusion of disability which is an issue reserved for the Commissioner pursuant to *Kidd* and *Turner, supra.*

Although Plaintiff complains that the ALJ did not discuss the diagnoses made by Dr. Bogdonovich (Doc. 12 at 11-13), her diagnosis was not inconsistent with the diagnoses of other treating physicians and thus there was no need for the ALJ to specifically address what is otherwise cumulative evidence. Deciding what weight to give competing evidence at the same analytical level, "such as contradicting multiple treating physicians, is an administrative finding for which the final authority rests with the Commissioner." *Bandy v. Astrue*, No. 2:10-cv-00119, 2011 WL 6141037, at *6 (M.D. Tenn. Dec. 9, 2011).

Plaintiff also contends that the ALJ mistakenly indicated that Dr. Marshall had examined Plaintiff when Dr. Marshall had not. (Doc. 12 at 14.) Plaintiff noted that the ALJ found that Dr. Marshall's opinions were consistent with Dr. Pestrue, who did examine Plaintiff. (*Id.* at 15.) I therefore suggest that Plaintiff has not alleged error of any significance to the decision of the ALJ since the examining and non-examining physicians' opinions are in accord. I therefore suggest that the ALJ's decision regarding what weight to give the treating source opinions is supported by substantial evidence.

    **c.**    **ALJ Partiality**

Plaintiff argues that the ALJ exhibited partiality against Plaintiff at the hearing. (Doc. 12 at 14-17.) The courts have long applied the presumption "that judicial and quasi-judicial officers, including ALJs, carry out their duties fairly and impartially." *Bailey v. Comm'r of Soc. Sec.*, 413 Fed. App'x 853, 854 (6th Cir. 2011); *see also Schweiker v. McClure,* 456 U.S. 188, 195, 102 S. Ct. 1665, 1670, 72 L. Ed. 2d 1 (1982). The Sixth Circuit has explained that

[t]he burden of overcoming the presumption of impartiality "rests on the party making the assertion [of bias]," *Schweiker,* 456 U.S. at 196, 102 S. Ct. at 1670, and the presumption can be overcome only with convincing evidence that "a risk of actual bias or prejudgment" is present. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S. Ct. 1456, 1464, 43 L. Ed. 2d 712 (1975). In other words, any alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference.

*Navistar Intern. Transp. Corp. v. U.S. E.P.A.,* 941 F.2d 1339, 1360 (6th Cir. 1991).

In the instant case, Plaintiff contends that the ALJ showed bias when he questioned her about Dr. Ossian's conclusion that she could not work "at this time," followed up by asking when she would be able to work, and ended with a statement that "[o]nce you get on a disability you're on it forever unless they cut you off . . . [a]nd I'm hesitant to do that unless you give me some idea where you're at." (Tr. at 37.) Plaintiff also refers to the ALJ stating, "You'd think you could learn to keep you hands to yourself" and then asking whether that was "one of the things you're learning at psyche?" (Tr. at 39.) Finally, Plaintiff complains about the ALJ asking whether Plaintiff was on drugs when she was in high school. (Tr. at 43.) Although the ALJ's style of questioning may have been more aggressive than some others, I suggest that none of these questions or comments reveal a risk of actual bias or prejudice. In addition, I note that the manner in which the ALJ ended the hearing shows that although he was active in his questioning role, he was not prejudiced against Plaintiff. The ALJ ended the hearing by stating, "It was very nice meeting you, you're a very nice lady" and he wished Plaintiff luck. (Tr. at 48.) I therefore suggest that bias is not evident from the record and, since it cannot be based on speculation or inference, Plaintiff has failed to rebut the presumption of fairness and impartiality. *See Bailey,* 413 Fed. App'x at 856 (presumption not rebutted by alleged hostility toward the plaintiff at hearing).

    **d.**    **Substance Abuse**

Plaintiff contends that the ALJ applied an erroneous legal standard in finding that substance abuse aggravated her symptoms. (Doc. 12 at 17-19.) The regulations provide that an ALJ must first determine whether a claimant suffers from a disability before proceeding, if needed, to a determination of whether the substance abuse is a "contributing factor to the determination of a disability." 20 C.F.R. § 416.935. Although substance abuse issues "should not be considered in the determination of disability unless and until the claimant is found to be disabled without considering them, 20 C.F.R. §§ 404.1535(a) and 416.935(a), the regulations do not prevent them from properly being considered for other purposes . . . [such as] a determination of [her] credibility." *Stroud v. Comm'r of Soc. Sec.*, No. 10-12515, 2011 WL 4576387, at *4 (E.D. Mich. Sept. 30, 2011).

In the instant case, the ALJ's opinion did not neatly compartmentalize the findings and, from my reading of the findings, it appears that credibility and RFC findings were effectively conflated. (Tr. at 20-22.) However, I note that the small paragraph dedicated to the topic of substance abuse (Tr. at 22) comes after and in explanation of his finding that Plaintiff's symptoms were only partially credible. (Tr. at 20.) Thus, although the ALJ's treatment of this issue is less than clear or ideal, I suggest that the substance abuse comment is directed more toward the proper determination of credibility rather than the improper purpose of determining disability. I therefore suggest that this issue does not merit overturning the ALJ's decision.

### 3.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.


   s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
                                        CHARLES E. BINDER
Dated: March 20, 2012                United States Magistrate Judge


### **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  March 20, 2012                    By____s/Patricia T. Morris_____
                                                    Law Clerk to Magistrate Judge Binder